IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHIRLEY PETTAWAY-DARDEN
    *Plaintiff*

    v.

WOODBOURNE CENTER, INC./NEXUS
CENTER
    *Defendant*.

Civil Action No. ELH-16-3100

## MEMORANDUM OPINION

In this employment discrimination case, Shirley Pettaway-Darden, plaintiff, has sued her former employer, defendant Woodbourne Center, Inc. ("Woodbourne"), under Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). ECF 1.[1] She alleges that she was wrongfully terminated on February 14, 2013, based on sex discrimination. Plaintiff attached the Charge of Discrimination ("Charge"), submitted to the Maryland Commission on Civil Rights ("Maryland Commission"), as an exhibit to the suit. ECF 1-1.[2]

The suit is rooted in events that occurred at Woodbourne's Residential Treatment Center ("RTC") in Baltimore, where plaintiff worked as a Direct Care Professional ("DCP"). The RTC is a facility for adolescent males with severe emotional and behavioral issues. While plaintiff was on duty during the overnight shift on February 11 and 12, 2013, two boys engaged in sexual activity in a bathroom. Defendant claims that the incident occurred because plaintiff fell asleep. Pettaway-Darden vigorously disputes that contention.

---

[1] In the Complaint, plaintiff identified defendant as "Woodbourne Center, Inc./Nexus Center." I shall use the name provided by defendant. *See* ECF 6 (Answer) at 1 n.1.

[2] At the outset, plaintiff was self-represented. She subsequently retained counsel. ECF 9. However, no amended complaint was ever filed.

Following discovery, Woodbourne moved for summary judgment (ECF 25), supported by a memorandum of law (ECF 25-1) (collectively, the "Motion") and numerous exhibits.[3]  *See* ECF 25-2 through ECF 25-19.  Defendant maintains, *inter alia*, that Pettaway-Darden was discharged for just cause and for legitimate, nondiscriminatory business reasons. In addition, defendant argues that plaintiff's suit contains claims that were not stated in the Charge.   In particular, defendant challenges plaintiff's claims relating to the denial of overtime based on sex and alleged harassment by a male coworker.  Pettaway-Darden opposes the Motion (ECF 30, "Opposition"), supported by exhibits.  *See* ECF 34-1 through ECF 34-9.  Woodbourne has replied (ECF 37, "Reply") and has provided an additional exhibit.  ECF 37-1.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I.      Factual Background[4]

### A.

Woodbourne is a private non-profit corporation licensed by Maryland's Department of Health.[5]  ECF 25-3 (Declaration of Steven Schreiber, Woodbourne's Human Resources Director) at 2-5, ¶ 4.  Woodbourne provides residential treatment for males aged 12 to 18 (the "clients")

---

[3] Two exhibits were incomplete.  Therefore, I directed one of my law clerks to contact counsel for Woodbourne to correct the omissions.  *See* ECF 39 (providing pages omitted from ECF 25-5), and ECF 40 (providing the complete deposition transcript of William Plummer).

[4] The electronic pagination does not always correspond to the page numbers on the pleadings or the exhibits.  I shall cite to the electronic pagination.

[5] The Maryland Department of Health and Mental Hygiene was renamed in July 2017, and is now known as the Maryland Department of Health.  *See* Md. Code (2015, 2017 Supp.), §§ 1-101, 2-101, 2-102 of the Health-General Article.

who are involved in the child welfare system, the juvenile justice system, and/or the mental health system. ECF 25-3, ¶ 3. In general, the clients have "severe behavioral and emotional problems" and are considered to be "a danger to themselves and others." *Id.* at 2, ¶¶ 4-5.

Pettaway-Darden began working for Woodbourne in 1988 (ECF 25-5, Deposition of Pettaway-Darden, at 7) and transferred to the RTC in 2000 or 2001, where she worked as a DCP. ECF 25-5 at 11, 16. At the RTC, clients "live, eat and are educated 24 hours a day, 7 days a week." *Id.* at 3, ¶ 6. Clients reside in one of four units that are staffed around the clock by both male and female DCPs. ECF 25-3 at 3, ¶ 7; ECF 25-12 (Declaration of Mackey-Jones), ¶ 5. One of the units was known as the Poseidon Unit (ECF 25-1 at 9) and is now known as the Game Changers Unit (ECF 25-3 at 3, ¶ 6) (hereinafter, the "Unit"). The Unit houses clients with harmful sexual behaviors. ECF 25-5 at 13; ECF 25-6 (Deposition of Plummer) at 4; ECF 25-7 (Deposition of Vincent-Poehlman) at 23. It has twelve rooms, with one client assigned per room. ECF 25-5 at 80.

DCPs are required, *inter alia*, to "provide[] timely and accurate communication to supervisory and management staff regarding significant events," including "issues of safety regarding the clients and/or staff." ECF 25-5 (DCP Job Description) at 319. And, DCPs are expected to "work[] with team members in order to complete daily work load, especially during short staff situations", and "to ensure positive communication, the safety of clients, and continuity of care." ECF 25-5 at 319. Plaintiff acknowledges she was aware of these requirements and knew they were "essential functions" and "core competencies" that are "required" of a DCP. ECF 39 (Deposition of Pettaway-Darden) at 3-4.

The DCPs are covered by a collective bargaining agreement ("CBA") between United Food and Commercial Workers Union Local 27 ("Union") and Woodbourne. ECF 25-3 at 3, ¶ 7;

ECF 25-3 at 7-38 (CBA). Under the CBA, Woodbourne may terminate an employee for violation of policies described in the employee handbook ("Handbook"). ECF 25-3 at 3, ¶¶ 7-8; ECF 25-3 at 13 (CBA, Art. 3.2). The Handbook prohibits, *inter alia*, "[s]leeping during working hours"; "failing to perform [the] job in a satisfactory manner"; and "failing to perform reasonable duties." ECF 25-5 (Handbook) at 234-35. Additionally, the Handbook states: "All employees must practice safety awareness by anticipating unsafe situations . . . ." ECF 25-5 at 262-63. Further, employees are admonished: "Violations of Woodbourne's safety policies may lead to disciplinary action, up to and including termination of employment." ECF 25-5 at 262-63.

Plaintiff acknowledges receipt of the 2008 Handbook in 2008. ECF 25-5 at 43-44; ECF 25-5 (Proof of Receipt Form) at 194. She also acknowledges receipt of an updated version of the Handbook on February 6, 2013. ECF 25-5 at 54-55. Moreover, plaintiff acknowledges that the Handbook requires employees to "immediately report any perceived violations of [Woodbourne's employee] policies." ECF 25-5 at 43-44. For example, if a Woodbourne employee is concerned that client care or safety is "falling short of regulatory standards, he/she should bring that concern to the attention of the supervisor, the program or department director or a member of senior management." ECF 25-5 at 76-77; ECF 25-5 (Handbook) at 261.

At the relevant time, Acquanetta Cabral was plaintiff's Shift Supervisor. ECF 25-5 at 16. She reported to Margaret Mackey-Jones, the Unit Coordinator. ECF 25-5 at 13; ECF 25-8 (Deposition of Cabral) at 7. Mackey-Jones reported to Maggie Vincent-Poehlman, the RTC Supervisor. ECF 25-5 at 14. The Human Resources Director was Elizabeth McMann. ECF 25-4 (Deposition of Patricia Nott) at 15. And, Patricia Nott, the person who ultimately approved plaintiff's termination, was Woodbourne's Vice President of Human Resources. *Id.* at 20-21.

In 2013, the year in which Pettaway-Darden was terminated, 51% of Woodbourne's staff

was female.  ECF 25-3 at 3, ¶ 9; ECF 25-3 at 40.[6]  Since then, the percentage of female employees has increased.  ECF 25-3 at 3, ¶ 9.  Steven Schreiber, Woodbourne's current Human Resources Director, avers in his Declaration: "Woodbourne has maintained and enforced an equal employment opportunity (EEO) policy in its employee handbook that forbids discrimination and harassment based on any category protected by law, including gender[.]"  ECF 25-3 at 3, ¶ 8.

## B.

The overnight shift at the RTC begins at 11:30 p.m. and runs to 7:30 a.m.  Generally, either two or three DCPs staff the Unit during that shift.  ECF 25-8 at 3-5.  During the overnight shift in question, Pettaway-Darden worked with William Plummer.  ECF 25-5 at 111-12.  Plummer has worked for Woodbourne since 1997 and as an overnight DCP for the Unit since 2001.  ECF 25-6 at 4-5.

On the night in question, plaintiff was assigned to provide "one on one" care for "Client R," who was deemed a suicide risk.  ECF 25-5 at 111-12.  During the shift, plaintiff completed and signed Client R's "Care and Observation Record for Safe Prevention and Intervention."  *Id.* at 99; ECF 25-5 (Client R Observation Record) at 325-26.  In 15 minute increments between 11:45 p.m. on February 11, 2013, and 6:15 a.m. on February 12, 2013, plaintiff reported that Client R was asleep in his room.  She did not describe any other behaviors in the "Comments" section of the record.  ECF 25-5 at 102; ECF 25-5 at 325-26.

Plummer was responsible for supervision of the other clients in the Unit.  ECF 25-6 at 4, 8-11.  Plummer's Log Notes reflect his observation at approximately 4:00 a.m. that the "Unit [was] safe, secure" and that all of the clients in the Unit appeared to be asleep.  *See* ECF 25-6

---

[6] Of the 25 DCPs terminated between 2013 and 2016, fourteen were male and eleven were female.  ECF 25-3, ¶ 9.

(Plummer's Log) at 25; *See also* ECF 25-6 (Deposition of Plummer) at 8, 10-11.

Shortly thereafter, Plummer told plaintiff he had to use the restroom, which was located in a staff area. ECF 25-6 at 9; ECF 25-5 at 134; ECF 25-5 at 328-29; ECF 25-6 at 25. Pettaway-Darden did not object or call a supervisor to request assistance during Plummer's absence. ECF 25-5 at 116-17; ECF 25-7 at 23-24. It is undisputed that, while Plummer was away from the Unit, two boys ("Client A" and "Client B") met in a bathroom and engaged in a sexual act. *See, e.g.*, ECF 1-1 at 2; ECF 30 at 9; ECF 25-8 at 10-13.

Plummer estimated that he was "gone ten minutes, if that long," and returned to the Unit shortly before 4:19 a.m. ECF 25-6 at 9. Upon his return, he saw Client A and Client B exit from the same bathroom. ECF 25-6 at 12-13; ECF 25-6 at 25. Because it "look[ed] like they came out of the same bathroom," Plummer told them to "hold up." ECF 25-6 at 13. Plummer immediately called Cabral, the nightshift supervisor. *Id.* She arrived at the Unit by 4:20 a.m.[7]

Cabral notified the nurse on duty and members of management, including Mackey-Jones and McMann, about the incident. ECF 25-8 at 11-13. Cabral also directed Plummer and Pettaway-Darden to complete incident reports describing what occurred. ECF 25-5 (Deposition of Pettaway-Darden) at 132-36; ECF 25-5 (Pettaway-Darden Incident Report) at 328-29; ECF 25-6 (Deposition of Plummer) at 21-22; ECF 25-6 (Plummer Incident Report) at 30.

Cabral prepared a report on February 12, 2013, detailing her interviews with Pettaway-Darden, Plummer, Client A, and Client B. ECF 25-8 at 19-20; ECF 26 (Cabral Incident Report). Cabral submitted her report to McMann on the same date. ECF 25-8 at 23-24. According to Cabral's summary of her interview of plaintiff, Pettaway-Darden gave Client A permission to use the restroom and did not see Client B leave his room. ECF 26.

---

[7] Plummer's Log notes indicate that Cabral arrived "on unit" by 4:20 a.m. *See* ECF 25-6 at 25. Cabral estimates she arrived by 4:10 a.m. ECF 25-8 at 8. The discrepancy is not material.

Of import here, a client at the RTC cannot leave his room and enter the hall without first obtaining permission from a DCP. ECF 25-5 at 81. Plaintiff recounted at her deposition that the procedure requires a client to announce, "Coming out." *Id.* This protocol allows the DCP to track a client's whereabouts. ECF 25-5 at 81-82, 92; ECF 25-6 at 23. When a client leaves his room without permission, a DCP is required to return him to his room and then assess the client's reason for wanting to leave. ECF 25-5 at 81-82. Pettaway-Darden was aware of this protocol. ECF 25-5 at 81. When Client A initially left his room, shortly after 4:00 a.m. on the night in question, he did so without Pettaway-Darden's approval. ECF 25-5 at 120. However, plaintiff then gave Client A permission to use the bathroom. ECF 26.

At her deposition, plaintiff recalled that, during the relevant time, she "happened" to see Client A's shadow "over her shoulder" and said: "'What is it you want . . . .'" ECF 25-5 at 120. According to plaintiff, Client A said: "'I have to use the bathroom.'" *Id.* Plaintiff responded: "'Okay.'" *Id.* Plaintiff explained that she was by herself, Client A "frightened" her, and Client A can be "very combative." *Id.* Plaintiff was aware that Client A had shown sexual predatory tendencies toward other boys on the Unit. ECF 25-5 at 81-89. She also knew he had been aggressive with staff members in the past and that he had a "bad temper." *Id.* at 121-23.

Plaintiff conceded at her deposition that she did not observe Client A after she gave him permission to use the restroom. ECF 25-5 at 121. She said: "[Y]ou don't have to watch them like that." *Id.* Notably, plaintiff claimed the Unit was not a sex offender unit and therefore Client A was not required to use a particular restroom. ECF 25-5 at 82. Plaintiff allowed Client A to use a bathroom further from where she sat in the Unit. ECF 25-6 at 23; ECF 25-13, ¶¶ 4-5; ECF 25-5 at 121-22. Pettaway-Darden also acknowledged that she did not see Client B leave his room or enter the bathroom where Client A was located. ECF 25-5 at 135-36; ECF 26. During

the time period when the two boys were in the bathroom, there is no record of any activity by Client R that would have distracted plaintiff. ECF 25-5 at 102, 325-26.

On the morning of February 12, 2013, Client A told Mackey-Jones that Pettaway-Darden was asleep when he first left his room. ECF 25-9 at 11. He claimed that "he had to wake her up" by "call[ing] her by her name" to "ask her to go to the bathroom." *Id.*

Client B also met with Mackey-Jones shortly after the incident. He told Mackey-Jones that "he had a sexual encounter with Client A" in the bathroom. ECF 25-9 (Deposition of Mackey-Jones) at 17. Client B also reported that "when he came out of his room[] Ms. Pettaway was sleeping. She did not see him. He did not ask for permission to go to the bathroom and said him and Client A waited until Ms. Pettaway is asleep . . . ." *Id.* at 15-16. Moreover, Client B recalled that "they have gotten away with a number of [other past] behaviors," including "[t]aking food out of the refrigerator" and "sneaking in each other's room[s]" while Pettaway-Darden was asleep during previous overnight shifts. *Id.* at 16.

In another interview on the date of the incident, Client B told Woodbourne Therapist Lauren Rosier that he had been able to leave his room and meet Client A in the bathroom because Pettaway-Darden was asleep. ECF 25-14 (Rosier email to McMann) at 9. In yet another interview of Client B on the day of the incident, Cabral reported that Client B told her he had called out to Pettaway-Darden but she "did not answer because she was asleep, so he came out of his room and went into the bathroom. [Client A] was in the bathroom already." ECF 26.

The RTC uses video surveillance to monitor and record activity in the Unit. ECF 25-9 at 5-10; ECF 25-15 (Deposition of Woodbourne's Corporate Designee) at 3. At the relevant time, cameras were located on both ends of the Unit. ECF 25-7 at 12; ECF 25-15 at 5-6. However, the recordings are no longer available. Defendant explains that in 2013 there was no policy

regarding preservation of such recordings (ECF 25-1 at 20 n.5), and, as a result, the video footage from the night in question was not preserved. ECF 25-4 at 13.[8] Notably, the recordings were shown to plaintiff shortly after the occurrence. ECF 25-5 at 136-37.

Vincent-Poehlman testified that she viewed the recordings on the morning of the incident. ECF 25-7 (Deposition of Vincent-Poehlman) at 8-11. Specifically, she stated that she "observed . . . Ms. Darden at the table rocking back and forth, appearing to be asleep . . . [n]odding her head." *Id.* She added, *id.*: "On the other camera, you could see the client coming out of his room looking straight at Ms. Darden . . . and just walking to the other bathroom." Vincent-Poehlman continued: "[Y]ou see another client coming out of the bathroom, saying something to Ms. Darden and then walking to the bathroom, the same bathroom that the other young man was in which was not his assigned bathroom." *Id.* at 15-16.

Mackey-Jones also reviewed the videos. She testified at her deposition that the video footage showed plaintiff sitting down while "Client A c[a]me out of his room and walked towards the bathroom at the other end of the unit." ECF 25-9 at 6-7. Additionally, Mackey-Jones "saw Client B come out of his room, look[] towards where Ms. Pettaway was sitting, and walk[] to the same bathroom that Client A walked into." *Id.* at 7. Mackey-Jones "saw no motion from Ms. Pettaway," even though "Client B was looking directly at her . . . ." *Id.*

On February 14, 2013, plaintiff met with Mackey-Jones, McMann, Vincent-Poehlman, and Union Representative Ruben Lopez to discuss the Woodbourne's investigation of the incident. ECF 25-5 at 137-38. At this meeting, plaintiff viewed the video footage. ECF 25-5 at

---

[8] Woodbourne cites the Deposition of Justin Grier, which is docketed at ECF 25-15. It references pages 9 and 10 for the proposition that the recordings were overwritten because Woodbourne lacked a video preservation policy in 2013. However, ECF 25-15 does not include pages 9 or 10. Nott, a former Woodbourne employee, "surmise[d]" that there was no procedure at the time to preserve the recordings. *See* ECF 25-4 (Deposition of Nott) at 13.

136-37. At her deposition, plaintiff acknowledged that she did not "know Client B was out of his room until [she had] seen the tape" during the meeting. *Id.*

After reviewing the video footage of the incident; Pettaway-Darden's log of Client R's activity; and the statements of Cabral, Plummer, Pettaway-Darden, Client A, and Client B, Vincent-Poehlman "concluded that Ms. Darden's failure to remain alert when two clients came out of their rooms and went to the same bathroom for a sexual encounter constituted gross neglect." ECF 25-10 (Declaration of Vincent-Poehlman), ¶ 10. Vincent-Poehlman recommended the termination of Pettaway-Darden based on gross negligence. ECF 25-7 at 21-23; ECF 25-4 at 7-24; ECF 25-9 at 20-26.

Nott discussed the matter with Vincent-Poehlman and McMann; reviewed evidence obtained during the investigation; considered Pettaway-Darden's training, performance history, and previous disciplinary history;[9] took into account the nature of the incident; and considered potential alternative forms of discipline for Pettaway-Darden. Ultimately, Nott determined that termination, rather than any other form disciplinary action, was the most appropriate course of action. ECF 25-4 at 19-24. At her deposition, Nott testified that plaintiff's "performance history" was a basis for the ultimate decision to terminate Pettaway-Darden. *Id.* at 22.

## C.

With respect to plaintiff's termination, the Union filed a grievance on her behalf, in accordance with the CBA. ECF 25-14, ¶ 6; ECF 25-14 (Union Grievance Letter) at 7. Nott responded to the grievance (ECF 25-14, ¶ 9), stating: "An alert staff member . . . sitting where Ms. Pettaway was sitting should have seen clients leaving their rooms and/or restrooms." *See*

---

[9] According to defendant, Pettaway-Darden had previously been disciplined for, *inter alia*, sleeping on the job, not monitoring clients, and failing to conduct bed checks. ECF 25-5 (Deposition of Pettaway-Darden) at 63-65; ECF 25-5 (Disciplinary Action Form) at 313-14.

ECF 25-14 (Nott's Answer to Union Grievance Letter) at 13. Additionally, Nott said, *id.*: "[T]ermination [was] justified due to the fact that Ms. Pettaway was not alert to the incident that occurred on the program while she was on duty." *Id.*

The Union pursued the matter to arbitration on Pettaway-Darden's behalf. Andrew Strongin, the arbitrator, heard testimony, received other evidence, and reviewed post-hearing briefs from both sides. ECF 25-5 at 152-55, 146; ECF 25-5 at 340-53 (Arbitration Decision). On November 16, 2013, Strongin found just cause for plaintiff's termination. ECF 25-5 at 152-55; ECF 25-5 at 340-53. He recognized that "it might have been preferable for Plummer not to leave grievant alone on the unit." *See* ECF 25-5 (Arbitration Decision) at 351. But, he stated that "grievant clearly should not thereafter have accepted responsibility for Client A while she was alone on the Unit in the midst of a one-on-one observation, that she had no good reason for having done so, and that her decision to do so is the principal cause of the sexual misbehavior that ensued between Clients A and B." *Id.*

### D.

Pettaway-Darden asserts that, on the night in question, she was assigned to observe Client R, who required plaintiff's undivided attention, and she was not responsible for other clients in the Unit. ECF 30 at 14-15, 18. According to plaintiff, it was Plummer's absence from the Unit that created the circumstances in which clients A and B were able to engage in a sexual act. *Id.* at 20. She maintains that she was subjected to disparate treatment when she, rather than Plummer, was punished for the sexual encounter between clients A and B. *Id.*

Plaintiff testified that Cabral was biased against women. According to plaintiff, Cabral "treated [male employees] like they was [sic] kings, and treated females like they were lower

than the men." ECF 25-5 at 17-18.[10] Plaintiff also said that "around the holidays" Cabral "used to bake pies" for Plummer and another male employee named Perry Bowles. ECF 25-5 at 18, 22-23. Plaintiff speculated that Cabral also baked pies for other unidentified male employees. ECF 25-5 at 23. Further, plaintiff testified that Plummer often drove Cabral to work. ECF 25-5 at 18; ECF 25-6 at 6. However, plaintiff also believed that Cabral favored Plummer over other male employees as well. ECF 25-5 at 24-25.

More generally, plaintiff said that female employees were afraid to report the misconduct of male employees "because who you going to go to if the females favor the males over the females" and because female employees were "afraid of losing their jobs." ECF 25-5 at 26-27. For example, Pettaway-Darden said that in 2012 she heard about a female employee, Mazeline Roberts, getting into a "physical fight" with a male employee inside Woodbourne's gym. ECF 25-5 at 29-31. According to plaintiff, Roberts's supervisor "did nothing" after Roberts reported the fight; Roberts later filed an EEOC complaint; and Roberts was passed over for a morning shift position that ultimately went to the man with whom she fought. ECF 25-5 at 30-31, 40. Additionally, plaintiff said she heard that McMann wrote a letter to the EEOC, "stating that [Roberts] started the fight." ECF 25-5 at 29-30. But, plaintiff conceded that she never saw the letter. ECF 25-5 at 30.

According to plaintiff, male employees often arrived late to work without consequence, but she was unable to recall examples of such conduct. ECF 25-5 at 36-37. Nor could plaintiff recall specific events, names, or dates associated with male employees being treated more favorably than female employees. ECF 25-5 at 37. Specifically, plaintiff said "it's a general

---

[10] Plaintiff concedes that Vincent-Poehlman never said or did anything to indicate she was biased against women. ECF 25-5 at 15-16, 63. And, plaintiff is unaware of facts showing that Nott harbored such bias. *Id.* at 157-59.

conversation females would have, and no particular day. Just something somebody would bring up . . . ." ECF 25-5 at 37-38.

Further, plaintiff testified that in 2012 she was sexually harassed by a coworker, Morris Jones. ECF 25-5 at 47-50. According to Pettaway-Darden, Jones "asked [her] to be his girlfriend . . . more than once, and then he started retaliating against [her]." ECF 25-5 at 48-49. Plaintiff allegedly told Jones: "'[W]e can't go out.'" ECF 25-5 at 49. Although plaintiff acknowledges that Jones never did anything physically threatening or humiliating, she alleges that he "started refusing to do his part of the work, and [she] was getting in trouble for it." ECF 25-5 at 49. For example, plaintiff claims that Jones did not contribute to a bed check on one occasion in 2012, resulting in Pettaway-Darden's suspension from work. ECF 25-5 at 51.

Plaintiff claims that she reported Mr. Jones's behavior to Ms. Mackey-Jones, but Mackey-Jones took no action. ECF 25-5 at 51-52. Nevertheless, Pettaway-Darden conceded that she did not follow the harassment complaint procedure outlined in the Handbook. *Id.*

Further, plaintiff alleges that she asked Mackey-Jones for overtime work in July 2012 but was denied such work based on plaintiff's sex; Mackey-Jones indicated that Woodbourne needed male staff to fill those particular shifts. ECF 1-1 at 3; ECF 25-5 at 192. Notably, Pettaway-Darden conceded that she does not know who actually worked the overtime shifts that she had requested. ECF 25-5 at 191-92. Moreover, this was the only time she ever asked Mackey-Jones for overtime. *Id*.

In Mackey-Jones's Declaration (ECF 25-12), she observed that Woodbourne endeavors to balance male and female DCPs to create an environment suitable for the clients living on the particular unit. *Id.* ¶¶ 5-6. She explained that some clients have histories of abuse or neglect inflicted by males and others by females, and the clients needed "both male and female authority

figures with whom they could relate." *Id.* ¶ 5. Additionally, male DCPs are specifically needed to accompany "male clients on close observation" to the restroom to protect the clients' "bodily privacy." *Id.* ¶ 6. Thus, there were times when Mackey-Jones contacted female DCPs, rather than male DCPs, for overtime hours, just as there were times male DCPs were contacted, rather than female DCPs. *Id.*

### E.

On November 20, 2013, plaintiff filed a Charge with the Maryland Commission, alleging that her termination was based on sex discrimination. *See* ECF 25-5 (Intake Questionnaire) at 354-57; ECF 25-5 (Notice of Charge) at 358-59; ECF 25-5 (Charge) at 360; ECF 1-1 at 1. In the Charge, plaintiff asserted: "I believe I have been discriminated against because of my sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended; with respect to discharge." ECF 25-5 at 360; ECF 1-1 at 1.

Plaintiff supplemented her claim on May 15, 2014, with an unsworn submission to the EEOC, titled "Justification for Male Discrimination Charges Resulting in Suspension and Dismissal by Woodbourne . . . ." ECF1-1 at 2-3. In that submission, plaintiff claimed that she was assigned "exclusively" to watch Client R, who was deemed a suicide risk, and she was assigned to monitor him "one on one . . . ." ECF 1-1 at 2. According to plaintiff, a DCP assigned to "one on one" duties is "not to leave" the client's room. *Id.* Further, she alleged that her coworker, Plummer, "left his assigned duties" as to ten clients and, when the incident occurred involving Client A and Client B, she was in her "assigned client's room", consistent with her duties, and thus she "was unaware of what was going on." *Id.*

Moreover, plaintiff alleged, *inter alia*, that the "arbitrator who voted against [her] is friendly with the Woodbourne Lawyer [sic] I saw him and the Woodbourne lawyer together on a

job assignment in 1990." ECF 1-1 at 2. Additionally, Pettaway-Darden complained that she "was the only one fired . . . when Mr. Plummer left his assigned duties." *Id.* at 2. Plaintiff also described two incidents in 2012 when she was punished more severely than a male employee, "Mr. Morrison,"[11] who plaintiff said failed to complete his portion of shared duties. *Id.* at 2-3. And, plaintiff described her unsuccessful request for overtime work in July 2012, which was rejected by Mackey-Jones, ostensibly in favor of male staff members. *Id.* at 3.

On June 10, 2016, the EEOC issued a "Dismissal and Notice of Rights" to plaintiff. ECF 25-5 at 361. It said, in part: "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." ECF 25-5 (Dismissal) at 361. This suit followed on September 8, 2016.

Additional facts are included in the Discussion.

## II.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

---

[11] The actual name appears to be Morris Jones. *See* ECF 25-5 at 48.

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III. Discussion

### A. Title VII — Generally

Title VII prohibits a covered employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Service, Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *DeMasters v. Carilion Clinic, et al.*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal–Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). It also prohibits an employer from retaliating against an employee because the employee filed a grievance or complaint regarding an employment practice that allegedly violated Title VII's antidiscrimination provision. *See* 42 U.S.C. § 2000e–3(a); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 415 (4th Cir. 2015).

Title VII states: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The "intentional discrimination provision [of Title VII] prohibits certain *motives*, regardless of the state of the actor's knowledge." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, ____U.S. ____, 135 S. Ct. 2028, 2033 (2015) (emphasis in original). In other words, an employer who acts with a discriminatory *motive* violates Title VII's prohibition against intentional discrimination. And, if "an employer offers a facially legitimate reason for its decision", but the plaintiff can show that the employer's "explanation was just a pretext for discrimination", then the employer is liable under Title VII. *Ricci*, 557 U.S. at 596.

Notably, "the existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

## B. Exhaustion

### 1.

Under Title VII, a plaintiff must file a charge with the EEOC before filing suit in a federal court. 42 U.S.C. § 2000e–5(f)(1); *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them.").

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

The exhaustion requirement of Title VII functions as a jurisdictional bar in federal court. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over

Title VII claims for which a plaintiff has failed to exhaust administrative remedies." *See also Jones*, 551 F.3d 300. When an aggrieved party fails to comply with the applicable administrative procedures, she has failed to exhaust her administrative remedies, and failure to comply generally mandates dismissal of a suit. *See, e.g.*, *Balas*, 711 F.3d at 407; *Miles*, 429 F.3d at 491; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002); *Lorenzo v. Rumsfeld*, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)).

Ordinarily, an aggrieved person must file a complaint with the EEOC within 180 days of the alleged discrimination. However, when state law bars the alleged employment practice and the charge is initially filed with a state agency, the state is a "deferral" jurisdiction, and the period for filing is extended to 300 days. *See* 42 U.S.C. § 2000e-5(e)(1); *Jones*, 551 F.3d at 300; *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002). Maryland is a deferral state; the Maryland Commission is the applicable State enforcement agency. *See, e.g.*, *Dewitt v. Clean Harbors Envtl. Servs., Inc.*, RDB-16-1705, 2017 WL 3116609, at *3 (D. Md. July 21, 2017); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 2017 WL 633312, at *3 (D. Md. Feb. 16, 2017).[12]

Even when a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas*, 711 F.3d at 408 (emphasis

---

[12] The Commission was previously known as the Maryland "Commission on Human Relations." During the 2011 legislative session, the Maryland General Assembly approved a change in the name; it is now known as the Commission on Civil Rights. *See* 2011 Md. Laws, Chap. 580; *see also Bd. of Directors of Cameron Grove Condo. II v. State Comm'n on Human Relations*, 431 Md. 61, 64 n.3, 63 A.3d 1064, 1066 n.3 (2013).

added); *see also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation.");

*Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) ("The

allegations contained in the administrative charge of discrimination generally operate to limit the

scope of any subsequent judicial complaint."). Although courts "recognize that EEOC charges

often are not completed by lawyers and as such must be construed with utmost liberality," courts

are "not at liberty to read into administrative charges allegations they do not contain." *Balas*,

711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the

four corners of the charge and the inference of "'any charges that would naturally have arisen

from an investigation thereof . . . .'" *Id*. at 407-08 (citations omitted).

Of importance, "[t]he touchstone for exhaustion is whether plaintiff's administrative and

judicial claims are 'reasonably related,' not precisely the same . . . ." *Sydnor*, 681 F.3d at 595.

The Court explained in *Sydnor*, *id*. at 594:  "[A]n administrative charge of discrimination does

not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her

judicial complaint are reasonably related to her EEOC charge and can be expected to follow

from a reasonable administrative investigation, she may advance such claims in her subsequent

civil suit." *Accord Southpeak Interactive Corp. of Del.*, 777 F.3d at 669; *Calvert Group, Ltd.*,

551 F.3d at 300; *Evans*, 80 F.3d at 963.

The Fourth Circuit's opinion in *Jones v. Calvert Grp.*, 551 F.3d 297, provides guidance.

In that case, plaintiff filed a charge with the Maryland Commission on Human Relations,

checking only the box for "retaliation." *Id.*  She stated:  "'I believe I am being forced to work in

a hostile environment and subjected to differential treatment in retaliation for filing' [a prior]

charge." *Id.*; *see id.* at 301.  Plaintiff subsequently brought suit, alleging discrimination based on

race, sex, and age, in violation of Title VII and the Age Discrimination in Employment Act

("ADEA"). *Id.* at 299. The defendant moved to dismiss under Rule 12(b)(6). *Id.* The district judge converted the motion to one for summary judgment and concluded that the plaintiff failed to exhaust her administrative remedies. *Id.* at 299-300. The Fourth Circuit affirmed. Noting that the plaintiff had checked only the box on the Charge for "retaliation," and "left unchecked the boxes for 'age,' 'sex,' or 'race,'" the Court concluded, *id.*: "The district court therefore properly determined that [plaintiff] failed to exhaust her administrative remedies with regard to those claims."

*Belyakov v. Medical Science & Computing*, 86 F. Supp. 3d 430, 440 (D. Md. 2015), is also instructive. In *Belyakov*, the plaintiff applied for a job with the National Institutes of Health through the defendant staffing firm. *Id.* at 432. When he did not get the job, plaintiff filed suit against the defendant, alleging age discrimination under the ADEA, national origin discrimination under Title VII, and retaliation under Title VII. In granting summary judgment in favor of the staffing agency as to the national origin claim, the district judge said: "Belyakov did not check the box for national origin discrimination in his EEOC charge, nor did he claim national origin discrimination or allege any facts relating to his national origin . . . in the narrative portion of his EEOC charge. . . ." *Id.* at 440. Because the plaintiff only asserted "claims for, and alleged facts relating to, age discrimination," the court determined that plaintiff failed to exhaust his national origin claim. *Id.*; *see also Byington v. NBRS Fin. Bank*, 903 F. Supp. 2d 342, 350 (D. Md. 2012) (finding that plaintiff failed to exhaust her administrative remedies as to age discrimination because she "did not check the box for discrimination based on age, and there is no reference to age discrimination in the narrative portion of the document"); *Talbot v. Foodservice, Inc.*, 191 F. Supp. 2d 637, 640 (D. Md. 2002) (same, for disability discrimination).

**2.**

Defendant asserts that any claim of sex discrimination presented for the first time in plaintiff's submission to the EEOC on May 15, 2014, is subject to dismissal for failure to exhaust and for untimeliness. ECF 25-1 at 40 n.15, 41; ECF 37 at 16-19.

Plaintiff's initial Charge of November 20, 2013, pertained only to her discharge. It did not include allegations of sex discrimination based on the denial of overtime hours, harassment by Morris Jones, or disparate treatment with respect to Jones. ECF 1-1 at 1; ECF 25-11 at 2. Indeed, the Charge stated that the earliest and latest dates of discrimination both occurred on March 21, 2013. ECF 1-1 at 1. Moreover, the facts underlying plaintiff's allegations about Jones (ECF 25-5 at 47-51) and the alleged denial of overtime hours (ECF 1-1 at 3; ECF 25-5 at 192) all occurred in 2012, and are not reasonably related to the events of 2013, when plaintiff was terminated. Indeed, the text of the Charge makes clear that Pettaway-Darden's only claim was premised on alleged discrimination stemming from her termination. ECF 1-1 at 1.

As noted, on May 15, 2014, six months after plaintiff filed the Charge (ECF 1-1 at 2-3), plaintiff submitted an unsworn supplement to EEOC, complaining about unrelated events that occurred in 2012. ECF 1-1 at 3-4; ECF 30 at 21-22. Plaintiff asserted in the supplement that "Mr. Morrison" was treated more favorably than plaintiff. *Id.* at 3. She described two instances when plaintiff was disproportionately disciplined in 2012 for Jones's failure to meet work expectations. ECF 1-1 at 2-3. And, she asserted that Mackey-Jones denied plaintiff's request for overtime in 2012. ECF 1-1 at 3. But, the supplement makes no mention of any sexual harassment by Jones. *See* ECF 1-1 at 2-3. Indeed, the sexual harassment claim was asserted for the first time at plaintiff's deposition (ECF 25-5 at 48-49) and then again in her Opposition. ECF 30 at 6-7. In any event, plaintiff does not explain how the submission on May 15, 2014, is

related to her initial Charge of November 20, 2013.

To be sure, plaintiff was self-represented when she submitted the Charge and the supplement. Nevertheless, a court is "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). Rather, the court is constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id*. at 407-08 (citations omitted). Plaintiff's Charge pertained only to the claim that she was wrongly discharged on February 14, 2013. The events in 2012 involving Jones and overtime are not "reasonably related" to her discharge. *Sydnor*, 681 F.3d at 595.

Of course, 29 C.F.R. § 1601.12(b) states that a "charge may be amended to cure technical defects or omissions," which may include the "clarif[ication] and amplif[ication of] allegations made" in the Charge. And, "amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received . . . ." *Id.* But, the allegations in the submission of May 15, 2014, presented six months after the Charge was filed, do not relate back.

In addition, the submission of May 15, 2014, does not comport with 42 U.S.C. § 2000e-5(b), which mandates: "Charges shall be in writing under *oath or affirmation* . . . ." (Emphasis added). And, 29 C.F.R. § 1601.9 requires that a charge "be in writing and signed and shall be *verified*." (Emphasis added). Plaintiff's submission was not verified or filed under oath.

I conclude that plaintiff failed to exhaust her administrative remedies as to claims that she was unfairly disciplined for Jones's professional shortcomings; that she was harassed by Jones; and that she was denied overtime in 2012 because of her sex.

## C. Termination

### 1.

Plaintiff contends in her Opposition that she was subjected to disparate treatment in connection with her termination. ECF 30 at 21. She asserts that Plummer, her coworker, was similarly situated, abandoned his post, and yet he was not terminated. *Id.*

Disparate treatment occurs when an employer has treated an employee "'less favorably than others because of' a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citation omitted). In a disparate treatment case, the plaintiff must establish "'that the defendant had a discriminatory intent or motive' for taking a job related action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) ("The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination."). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*, 540 U.S. at 52 (2003).

At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989). With regard to proof of intentional discrimination, "[a]s in any lawsuit, the plaintiff may prove his [or her] case by direct or circumstantial evidence." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *accord Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.

2006) (internal quotation omitted); *see also Black's Law Dictionary*, "Direct Evidence" (10th ed. 2014) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

"Applying the usual Title VII analytical construct for sex discrimination claims," a court should "first consider whether [plaintiff] has shown any direct evidence of discrimination." *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 446 (4th Cir. 2013), *rev'd on other grounds*, ____ U.S. ____, 135 S. Ct 1338 (2015). In the absence of "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic," a plaintiff in a Title VII case may use the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *Young*, 135 S. Ct. at 1345; *see Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (retaliation case).[13]

The *McDonnell Douglas* proof scheme applies at trial. Nevertheless, it has some utility at the summary judgment stage. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting racial discrimination may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . ."); *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013) ("Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas* . . . .").

---

[13] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII. However, the burden-shifting methodology it endorsed has been adapted for use in other statutory contexts, including Title VII claims of sex discrimination. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying the *McDonnell Douglas* framework in an employment discrimination case under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying the *McDonnell Douglas* framework to an employee's claim of age discrimination).

In the absence of direct evidence, a plaintiff may create a rebuttable presumption of discrimination by establishing, by a preponderance of evidence, a "prima facie case" of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005) ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination."). Although the precise formulation of the required *prima facie* showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination," *Burdine*, 450 U.S. at 253.

In a termination case under Title VII, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2012) (internal quotations omitted).

As noted, if the plaintiff can establish a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason for treating employees outside the protected class better than employees within the protected class." *Young*, 135 S. Ct. at 1345 (internal quotations omitted); *see Reeves*, 530 U.S. at 142; *Hoyle*, 650 F.3d at 336. Once the defendant produces, "through the introduction of admissible evidence," legitimate, non-discriminatory reasons for its disputed employment action, "the presumption raised by the prima

facie case is rebutted," *Burdine*, 450 U.S. at 255, and "drops from the case . . . ." *Id.* at 255 n.10. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden of production, the plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *see also St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

"[T]he plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be material." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007) (internal quotations omitted). Rather, to show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256), and that discrimination was the true reason for the adverse employment action. *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false,

*and* that discrimination was the real reason") (emphasis in *Hicks)*; *accord Adams*, 640 F.3d at 560.

When the question at issue is whether the "'decision maker'" acted with discriminatory animus, only the "'perception of the decision maker'" is "'relevant'" to the question. *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citation omitted). However, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F.Supp.2d 314, 329 (D. Md. 2003). In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (brackets omitted) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)).

In support of plaintiff's claim of sex discrimination, she asserts, *inter alia*, that Cabral had a general propensity for showing favoritism towards male employees by treating them like "kings", and by "bak[ing] pies" for Plummer and a male employee named Perry Bowles, "basically around the holidays." ECF 30 at 4-5; ECF 25-5 at 23.[14] Additionally, plaintiff complains that when she told McMann that "[n]obody relieved me to go to the bathroom, McMann responded, "'it don't matter.'" ECF 25-5 at 140. And, plaintiff states that Vincent-Poehlman recommended plaintiff's termination to McMann and Nott (ECF 30 at 10; ECF 34-6 at 2),[15] without taking into account Pettaway-Darden's personnel file and without interviewing

---

[14] Plaintiff concedes that Cabral also favored Plummer over his male colleagues. ECF 25-5 at 23. This suggests that Cabral favored Plummer in general, not that Cabral intentionally discriminated against plaintiff based on sex.

[15] Curiously, the portion of the record plaintiff cites does not mention Vincent-Poehlman.

Plummer. ECF 30 at 10; ECF 34-5 at 5.[16] Yet, in her Opposition, plaintiff cites a portion of the record describing McMann and Nott reviewing "documents" that seem to be Pettaway-Darden's personnel file. ECF 34-6 (Deposition of Nott) at 2 (describing documents containing plaintiff's "training" and "previous disciplinary history").

In any event, plaintiff does not assert direct evidence of intentional discrimination. Therefore, she may rely on the *McDonnell Douglas* burden-shifting framework to create a presumption of discrimination, and she "may avoid summary judgment by proceeding" under that same framework. *Pettis*, 592 F. App'x at 160; *see Stokes*, 512 F. App'x at 282.

**2.**

As noted, to establish a prima facie case of sex discrimination under Title VII based on an employee's termination, the plaintiff must show:

> (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Bonds*, 629 F.3d at 386 (internal quotations omitted).

Pettaway-Darden is a member of a protected class, and she suffered an adverse employment action. Further, she insists that she "was meeting her employer's legitimate performance expectations pursuant to the written directive and verbal instruction given to her on the date of the incident, requiring her to monitor only Client R. Therefore, she insists that she

---

Rather, it describes a conversation between Nott and McMann in which there is no reference to any recommendation by Vincent-Poehlman. ECF 34-6 at 2.

[16] Plummer was interviewed by Cabral. *See* ECF 25-8 at 20. The portion of the exhibit plaintiff cites (ECF 34-5 at 5) does not mention Pettaway-Darden's personnel file. Rather, it refers to the undisputed fact that Vincent-Poehlman did not personally interview Plummer after the incident. Instead, she delegated that responsibility to the Shift Supervisor and Unit Coordinator, consistent with Woodbourne's standard practices. *Id.*

satisfies the third element of the prima facie case for gender discrimination." ECF 30 at 15-16. Moreover, she contends, *id* at 14:

> Defendant seeks to hold Plaintiff Darden to an illegitimate "expectation" that was inconsistent with the Defendant's written policy, and was otherwise never relayed to her by any employee of the Woodbourne facility. The mandate of the [one-on-one] policy provides that "observation will be continuous, with no exceptions and no other duties assigned to the care provider," and has been applied literally in practice by employees comparable to Plaintiff Darden, such as Mr. Plummer, as he unequivocally testified that "a person that's the one-on one person, that's their job solely and only. Eyes on. No exceptions."[17]

As to the fourth element, plaintiff does not argue that her "position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds*, 629 F.3d at 386. Moreover, she does not controvert that, at the relevant time, Woodbourne employed more women than men, and that all of the decision-makers here were female. Additionally, plaintiff does not dispute Woodbourne's evidence that, "of the 25 DCPs terminated involuntarily between 2013 and 2016, 14 were male while only 11 (including Plaintiff Pettaway-Darden) were female." ECF 25-3, ¶ 9.

In any event, I shall assume, *arguendo*, that plaintiff has established a prima facie case of termination based on sex discrimination. *See, e.g.*, *Holland*, 487 F.3d at 218; *Hux*, 451 F.3d at 314. Therefore, Woodbourne has the burden to show a valid, nondiscriminatory reason for its decision to terminate plaintiff.

### 3.

Woodbourne contends that it terminated Pettaway-Darden based on its belief that, on the

---

[17] Plaintiff cites "*Id.* at 171; Exhibit 2" for this proposition, without providing a citation for the written policy or any indication about what the *id.* refers to, and without providing a pin cite within Exhibit 2 (Deposition of Plummer), which consists of 36 transcript pages. I presume plaintiff intended to cite ECF 34-4 (Close Observation Policy), ¶ 2, for what plaintiff refers to as the "mandate of the policy." And, plaintiff appears to refer to ECF 34-1 at 3 for Plummer's statements. I remain uncertain as to the reference to "*Id.* at 171."

night of the incident, she fell asleep while on duty and, as a result, she failed to monitor client activity in the Unit, which enabled two clients to engage in sexual activity in a bathroom. ECF 25-7 at 15-16; ECF 25-8 at 19-22; ECF 25-9 at 4-5, 7, 11, 15-16; ECF 25-14 at 9; ECF 26. Even assuming that plaintiff did not fall asleep, Woodbourne has shown that plaintiff was unaware of Client A's whereabouts after she allowed him to use the restroom, and that she did not know Client B had left his room.

When determining satisfactory job performance, it is the perception of the decision maker that is relevant, not that of the employee. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citation omitted) (stating that the plaintiff's own testimony about his job performance cannot establish a genuine issue as to whether he was meeting his employer's legitimate expectations). An employer's expectations of its employees are "legitimate" when they are honestly held, regardless of whether the plaintiff agrees with those expectations. *See Wells v. Briggs Const. Equipment, Inc.*, 3:08–3634–JFA–PJG, 2010 WL 2991673, at *4 (D.S.C. Mar. 3, 2014) (citation omitted) (stating that "a plaintiff must satisfy the employer's honestly-held expectations"). Of course, a "legitimate" expectation cannot be a mere "sham designed to hide the employer's discriminatory purpose." *Warch*, 435 F.3d at 518. However, "[a]s long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers." *Wells*, 2010 WL 2991673, at *4 (citing *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997)) (Posner, J.); *see Walker*, 775 F.3d at 211 (quoting *DeJarnette*, 133 F.3d at 299) (stating that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination'").

Clients A and B consistently told Cabral, Mackey-Jones, and Rosier (Client B's therapist)

that plaintiff had fallen asleep. *See* ECF 25-8 (Deposition of Cabral) at 19-22; ECF 26 (Cabral Incident Report); ECF 25-9 (Deposition of Mackey-Jones) at 4-5, 10-17; ECF 25-12 (Declaration of Mackey-Jones), ¶ 8; ECF 25-12 (Mackey-Jones Memorandum) at 5-6; ECF 25-14 (Declaration of Nott), ¶ 7; ECF 25-14 (Rosier email to McMann) at 8-9; ECF 25-4 (Deposition of Nott) at 31. Significantly, it is undisputed that the clients never reported that any other DCP fell asleep. ECF 25-14, ¶ 7; ECF 25-14 at 8-9.

As noted, Vincent-Poehlman testified that she viewed the video recordings on the morning of the incident and "observed . . . Ms. Darden at the table rocking back and forth, appearing to be asleep." ECF 25-7 at 15. As indicated, Mackey-Jones also viewed the videos and testified that Client B left his room, and she "saw no motion from Ms. Pettaway," even though "Client B was looking directly at her . . . ." ECF 25-9 at 6-7. According to defendant's employees, Pettaway-Darden appeared oblivious to Client A and Client B as they exited their rooms and entered the same bathroom. *See* ECF 25-7 (Vincent-Poehlman) at 15; ECF 25-9 (Mackey-Jones) at 6-7; ECF 25-4 (Nott) at 11. Notably, Pettaway-Darden conceded that she was unaware Client B had left his room until she had seen the tape herself. ECF 25-5 at 136-37; ECF 26. Thus, at the very least, Woodbourne had a valid basis to conclude that plaintiff was not alert to the clients housed in the Unit

According to Woodbourne, this was not the first time that plaintiff was found sleeping on the job. Plaintiff was disciplined in 2009 for sleeping during a shift. ECF 25-5 at 57-65; ECF 25-5 (Disciplinary Action Form) at 313-14; ECF 25-5 at 57-65; ECF 25-5 (Letter to Pettaway-Darden from Sharon Scibel, Interim Director of Human Resources, dated September 9, 2009) at 314. Further, Woodbourne points out that the Handbook contains "Standards of Conduct," the violation of which may lead to termination of employment. ECF 25-5 (Handbook) at 234.

Number 8 on the list is: "Sleeping during working hours." *Id.*

Vincent-Poehlman averred in her Declaration, ECF 25-10, ¶ 10: "The severity of the discipline imposed [on plaintiff] was based on the nature of the conduct that occurred as a result of [her] neglect." By "failing to remain alert during her shift, [Vincent-Poehlman] sincerely believed that Ms. Darden jeopardized the safety of *both* the one on one client and the safety of the other clients on her unit, as well as her own safety." ECF 25-10, ¶ 11 (emphasis in original).

According to Nott, plaintiff's "performance history" was one of the bases for Woodbourne's ultimate decision to terminate Pettaway-Darden, rather than merely reprimanding her. ECF 25-4 at 22; *see* ECF 30 at 10; ECF 34-6 at 2. In particular, Nott and McMann considered the four previous times plaintiff had been disciplined by Woodbourne, which included: (1) A written warning on September 2, 2009, for failing to document events and activities that occurred during an overnight shift (ECF 25-5 at 56-60; ECF 25-5, Disciplinary Action Form, at 311-12); (2) a written warning on September 1, 2009, and a five-day suspension for sleeping on the job, not monitoring clients, and failing to conduct bed checks (ECF 25-5 at 63-65; ECF 25-5, Disciplinary Action Form, at 313-14); (3) a written warning on May 2, 2012, for failing to document a consequence given to a client for bad behavior (ECF 25-5 at 65-67; ECF 25-5, Disciplinary Action Form, at 315); and (4) a written reprimand and one day suspension on June 25, 2012, for failing to perform bed checks and complete a bed check log. ECF 25-5 at 67-71; ECF 25-5 (Disciplinary Action Form) at 316-17.

Woodbourne has produced evidence sufficient to demonstrate that it terminated Pettaway-Darden based upon its informed belief that, on the night in question, plaintiff neglected her duties by failing to be alert to the activities of clients A and B in the Unit. It is not the court's "'province to decide whether an employer's reason for terminating an employee was wise, fair,

or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker*, 775 F.3d at 211 (brackets omitted) (citation omitted) (quoting *DeJarnette*, 133 F.3d at 299).

To be sure, plaintiff disputes that she fell asleep. But, defendant has articulated a nondiscriminatory basis for its belief that plaintiff fell asleep on the job and neglected her duties. Therefore, Woodbourne has provided valid, non-discriminatory reasons for its termination of plaintiff. Thus, the burden shifts to Pettaway-Darden to demonstrate that Woodbourne's justification for plaintiff's termination is pretext for sex discrimination. *See Paolino v. U.S. Airways, Inc.*, 2016 WL 304640, at *6 (D. Ariz. Jan. 26, 2016).

**4.**

Plaintiff insists that she was unlawfully discharged because Plummer left the Unit to use the restroom; Plummer ignored his ten clients; and plaintiff was only responsible for one suicidal client, for whom she was required to provide one-on-one care. ECF 30 at 14-16, 18-20. As indicated, plaintiff maintains that she was justified in failing to monitor Client A and Client B because, on the night in question, she was assigned to one-on-one care for Client R, which relieved her of any obligation to monitor other clients in the Unit. *Id.* at 14-16.

As defendant puts it, however, plaintiff's claim of sex discrimination "rings hollow." ECF 37 at 2. According to Woodbourne, "the circumstances under which [plaintiff] was left alone on the unit" are "a distraction from the conduct for which she was terminated": the "fundamental failure when [plaintiff] was alone on the unit . . . to safeguard the clients in her charge from precisely the sort of harmful sexual behaviors for which they were placed in [Woodbourne's] care." ECF 25-1 at 20-21; ECF 25-5 at 348.

Woodbourne vigorously disputes plaintiff's contention that she was not required to

provide any supervision in Plummer's absence. It maintains that one-on-one assignment did not relieve her of her oversight responsibilities during Plummer's bathroom break. *See, e.g.*, ECF 25-10, ¶ 9. Defendant cites Vincent-Poehlman's Declaration that one-on-one care duties are to be fulfilled "in conjunction with the broader responsibilities of a DCP, and not in isolation." ECF 25-10, ¶ 9. Further, Vincent-Poehlman asserts that one-on-one care does "not relieve any DCP from the broader responsibilities of being aware of, and promptly reporting to management, any safety concerns on their unit." ECF 25-10, ¶ 9. Moreover, the DCP job requirements obligate a DCP to ensure client safety and immediately report to management unsafe client behaviors. ECF 25-5 at 319.

Plaintiff points to a statement of Vincent-Poehlman in which Vincent-Poehlman testified that she did not recall whether she had performed an observation where a DCP "left the unit for an extended period of time." ECF 30 at 15; *see* ECF 34-5 at 2. Plaintiff also cites a statement by Nott in which Nott testified that she did not recall if Woodbourne had a "protocol, procedure, standard operating procedure in place which dictated explicitly that if a DCP is left alone on a unit when there are two DCPs staffing that unit, that the DCP left alone assumed responsibility for that entire program." ECF 30 at 15; *see* ECF 34-6 at 3. Of course, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the plaintiff as the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland*, 850 F.3d at 628; *FDIC*, 720 F.3d at 173. But, plaintiff must also "'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting former Fed. R. Civ. P. 56(e)). And, a mere scintilla of evidence is insufficient. *Anderson*, 477 U.S. at 252.

Plaintiff acknowledged that a DCP must ensure "the safety of clients, and continuity of

care", especially "during short staff situations," such as the brief period of time Plummer was away from the Unit. ECF 39 at 3-4; ECF 25-5 (DCP Job Description) at 319. She also conceded that she was aware of Client A's aggressive and predatory behaviors. ECF 25-5 at 81-89, 120-23. And, she knew that, at the time in issue, a client had to obtain permission from a DCP to leave his room. ECF 25-5 at 81-82, 92, 120; ECF 25-6 at 23. Yet, Client A initially left his room without permission, and plaintiff did not require him to return to his room. Instead, she immediately allowed him to use the bathroom and failed to observe his movements after allowing him to use the restroom. ECF 25-5 at 120-21. As noted, she recalled: "[Y]ou don't have to watch them like that." *Id.* at 121. Moreover, Pettaway-Darden admitted that she did not know Client B had left his room until she reviewed video footage of the incident. ECF 25-5 at 136-37.

Plaintiff suggests that clients A and B were untruthful in claiming that plaintiff fell asleep while on duty. As to clients generally, she asserted: "[T]hat's the number one thing they say staff be doing. They have been doing that since I've been working the job." ECF 30 at 19-20; ECF 25-5 at 128-29. However, plaintiff concedes she is unaware of any prior occasion when Client A or Client B made such an accusation. ECF 30 at 19-20; ECF 25-5 at 128-29. *See Myers v. Wood*, 12-cv-00422-JFA, 2013 WL 4823171 at *8 (D.S.C. Sept. 9, 2013) (holding that pretext could not be established based on the employee's speculation that a customer complaint about her was fabricated). In any event, plaintiff does not provide persuasive authority for the proposition that an employer may not credit the information obtained during an investigation.

At her deposition, Pettaway-Darden stated, for the first time, that on the night in question she moved her chair into Client R's room because she became concerned that he might be trying to harm himself under the covers. ECF 25-5 at 104-05. Plaintiff offered this as an explanation

for why she was unaware of the activities of clients A and B. *Id.* However, Pettaway-Darden's contemporaneous report of Client R's activity refuted her post-incident explanation. The report indicates that Client R was asleep during the relevant time period. ECF 25-5 at 325-26. And, Vincent-Poehlman stated: "If indeed Client R was thrashing about and there was any concern that he might be trying to harm himself under his bed covers," then "it would have been incumbent upon Ms. Darden to note this in the one on one log and contact a medical professional or supervisor immediately . . . ." ECF 25-10, ¶ 11 (emphasis in original).

Indeed, such a failure would violate the "Close Observation Policy" plaintiff relies upon in her Opposition, ECF 30 at 20; ECF 34-4 (Close Observation Policy), ¶ 8: "The direct care professional must maintain the Care and Observation Record . . . ." Moreover, Vincent-Poehlman stated: "Failure to input the correct code [in the one-on-one log] describing the behavior of a client creates a false medical record and constitutes a failure to provide timely and accurate information to the medical team, which is, in and of itself, a violation of a DCP's duties." ECF 25-10, ¶ 11. Therefore, even if Client R had required Pettaway-Darden's attention, plaintiff's failure to record Client R's actions in the one-on-one log is, in itself, grounds for discipline.

Defendant had a reasonable expectation that Pettaway-Darden would attend to the Unit during Plummer's brief absence, especially given that Client R was asleep. ECF 25-5 (Deposition of Pettaway-Darden) at 101-02; ECF 25-5 (Client R Observation Record) at 326; ECF 25-9 (Deposition of Mackey-Jones) at 21; ECF 25-9 (Disciplinary Action Form) at 30. And, if Pettaway-Darden believed that she could not take on the additional task, Woodbourne's policies required her to ask management for assistance, which she did not do. ECF 25-5 at 116-17; ECF 25-7 at 23-24. Of import, Pettaway-Darden does not dispute the validity of

Woodbourne's policy requiring an employee to report concerns regarding client care or unsafe situations immediately. ECF 25-5 at 42-47; ECF 25-5 (Handbook) at 260-61. Clearly, defendant had a reasonable basis for its belief that plaintiff failed to meet the broader responsibilities of a DCP. ECF 25-10 (Declaration of Vincent-Poehlman), ¶¶ 7, 9.

It is also noteworthy that the parties proceeded to arbitration, and the arbitrator upheld plaintiff's termination. Pettaway-Darden's challenge to the decision of the arbitrator is strained, if not specious. The decision of the arbitrator supports the conclusion that plaintiff has not shown discriminatory intent in regard to her termination. *See Collins v. New York City Transit Authority*, 305 F.3d 113, 119 (2d Cir. 2002).

### IV.     Conclusion

This Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with discrimination . . . ." *DeJarnette*, 133 F.3d at 298-99. Put another way, it is not the court's role to second guess Woodbourne's legitimate business decision to terminate plaintiff. *See Walker*, 775 F.3d at 211; *see also Hux*, 451 F.3d at 319 (noting that the "'perception of the decision maker'" is "'relevant'" to the question of whether the "'decision maker'" acted with discriminatory intent). For the reasons set forth above, Woodbourne has clearly shown that its decision to terminate plaintiff was not a pretext for sex discrimination.

For the foregoing reasons, I will grant Woodbourne's Motion (ECF 25). A separate Order follows, consistent with this Memorandum Opinion.


Date:  November 28, 2017                                    _____/s/_____
                                                           Ellen L. Hollander
                                                           United States District Court